Good morning, Your Honors. Mark Sagis on behalf of the appellant Mary Kay Beckman. If I could reserve three minutes for rebuttal. Your Honor, if you recall, we were here last year on the same case and we hashed out a number of issues. The Ninth Circuit ruled in light of Jane Doe No. 14 that if, in fact, the information in question came from a third party and was received by the defendant and the defendant failed to warn its users of this dangerous condition, that they would be liable or a failure to warn claim would be viable and it would be allowed to proceed certainly past the pleading stage. So what we're asking for, because these are requirements in the State of Nevada, we are requesting that this Court recognize a special relationship between Match.com and Mary Kay Beckman. What's your best case for showing that Nevada courts would impose a special relationship under the circumstances here? There are a number of them, but the most powerful one, I think, is Sialaba v. Brandeis. There's also Sparks v. Alpha Tau. Now, what Sialaba says, and I'll quote it, Since the ability of one of the parties to provide for his or her own protection has been limited in some way by the submission to the control of the other, a duty should be imposed upon the one possessing control and thus the power to act to take reasonable precautions to protect the other from assaults from third parties. What was the relationship in that case? This was a woman who rented an apartment in a brand new apartment complex. She went into her brand new apartment once she had moved in, and across the hall was an unfinished apartment that was unlocked. A killer was hiding in there, living in there, and she was attacked and brutally maimed. Now, she sued the apartment complex and the builder, and the court found in her favor, saying that the builder exercised control over the premises sufficient enough to have finished the door, put a lock on it, take a reasonable precaution, as the court had said, quoting the court, take a reasonable precaution to protect this individual other tenant. And by leaving the door unlocked and unfinished, they exposed her to this attack. And so, and that's one of kind of the more traditional examples, and I'm just curious if you, you know, whether the Nevada Supreme Court has expanded that relationship concept beyond like the guest and innkeeper, teacher, student, restauranteur, patron. Yeah, there's a list. So, because when we're deciding whether the parties have a special relationship, as in that case that you, it looked like you were referring to, we looked to whether the defendant had control over the plaintiff's safety. And I'm just trying to figure out what aspect of Ms. Beckman's safety did Match have control over? They had control over whether or not she would interact with, or choose to interact with a known killer, a serial killer. So, if they control unilaterally the information related to whether or not this guy is dangerous, and they, and they match her up, remember, Your Honor, they take an additional step and match these people. How could Match have controlled Mr. Ridley's violent conduct or, you know, Ms. Beckman's decision to meet up with him? They couldn't control Ridley's conduct. They could control Ms. Beckman's, Mary K. Beckman. And how, the question was how. Just like this Court ruled last year in Jane Doe No. 14, if the Internet service provider, in that case Internet Brands, has received information of a dangerous situation or condition, they have an obligation to warn other users. In that case, it was the two guys who were raping women who were attempting to be models. It was a fake model shoot. They drugged them. And the website knew of this information and failed to post a warning, failed to let these models who were meeting with these gentlemen know that this was a risk. It was a known risk. Now, in Match's case, very simply, if Mary K. Beckman visits Wade Ridley's profile and they've received communications that he is a serial killer or a rapist or has very violent propensities, an email generated by Match could be sent as a warning. That is not content. I'm not asking Match to edit content. I'm not even asking Match to remove the profile of a murderer, even though they should. The CDA of 1996 protects them from that obligation of having to remove the profile of a serial killer, even if they know he's a serial killer, they could leave it up because forcing them to take his profile down would be editorial in nature, and I understand that. What we are asking, just like in Jane Doe No. 14, is that this Court impose an obligation when there's a legitimate warning, just like they had in that Internet Brands, Jane Doe No. 14 Internet Brands case, when there's a legitimate warning to generate their own warning, and opposing counsel had said in his brief that, you know, we've got to defame this person by posting the warning for millions of people to see, a direct email communication. In that case, they didn't address a special relationship. They were only dealing with a CDA preemption. The defendants in that case ran a modeling, I guess, network website, and they had knowledge from an outside source that two particular individuals were using their site to locate victims for a rape scheme. This seems a little bit different, especially because you're arguing under the Nevada Special Relationship Law. Yes. And the interesting fact on Jane Doe No. 14 was the sentence that stands out that says we are not being asked to consider if a special relationship exists in this case. In other words, that's a matter you could take up later if you want, but we're not addressing that right now. What the Court, the Ninth Circuit was addressing in Jane Doe was whether or not they had a obligation, an affirmative obligation, to warn. So what I'm asking this Court to find is that special relationship. Yeah. And this was tragic. This was terrible, what occurred here, without a doubt. I don't think anybody's going to say anything other than this was just horrific, what Ms. Beckman went through. We're trying to sort out the legal principles here and figure out whether there was this special relationship. Also, I'm curious, at the last argument on this case, I was very intrigued because you mentioned that Mr. Ridley had attacked two other women. You stood there. That we know of. There's probably more. Why wasn't this included in your amended complaint to show knowledge and foreseeability? I was just curious. I know you're focusing on special relationship. Yes. This Court had asked, had ruled in the last decision that if Mary Kay Beckman could amend her complaint, if you recall, to specifically allege that they knew, not that they should have known, but that they knew he was dangerous, then we should be allowed to make that allegation, which we did. We amended the complaint and said they knew. And you know, this heightened pleading standard that I keep reading in the other side, there are referencing cases that are predominantly about Rule 9, which would be fraud and you have to plead with particularity. Essentially, they want me to make the case in the complaint where Twombly just says it has to be plausible. You have to make a reasonable, plausible allegation so that they could respond. And we're beyond that. Well, you promised at the last panel hearing that you could allege Match had actual knowledge. I did. I did, in fact, plead that. Well, you did that on information and belief. No. Right? I was told by, I think, Judge Hurwitz to exclude. Show us the paragraph in your amended complaint where you allege that directly. You don't allege specific facts about it. I do not allege the specific facts, but of course I could. But am I obligated to? Well, what do you allege? Show me. Just a moment. Our question is, are we obligated to a heightened pleading standard which would be flawed or? Well, just a minute. Just a minute now. Judge McGeer said you promised at the last panel that you could allege directly that they had knowledge. Now, where do you allege that in your amended complaint? Well, the Court's indulgence. Judge, if you have in front of you, because I can't find it on the fly, but if you have in front of me the fact that it was alleged in front of yourself that it was alleged that way, I mean, it's my recollection. I don't have the paragraph that we alleged specifically that matched new and continued to match unsuspecting subscribers. I mean, I've read it so many times I can quote it. Failed to warn of the dangerous propensities of Wade Ridley when they knew in advance that he was in fact dangerous. Counsel, outside the four corners of your amended pleading, you provide information based on your own investigation. And I gather that's what you have in mind when you say you could prove actual knowledge? Yes. The other side points out that even on that score, you can't prove actual knowledge because all you have are people telling you that they told third parties. Right. And so let me ask you, suppose you were given an opportunity to amend yet again, could you allege facts on a good faith basis that Match.com actually knew that this individual had a propensity to attack women? And again, That's a yes or no, I think. Yes, absolutely, yes. And how could you do that? I thought you said the last time, absolutely yes. Yes, I said absolutely. Now, is the court requesting that I actually put the facts in the complaint, the specific facts related to the allegations? I guess my question would be, and I don't mean to be overbearing here. No, you're not. My question would be, what basis do you have for stating that Match.com actually knew about this man's dangerous propensities? Two things. First, let me get right to the facts. We spoke to the family of one of the deceased former individuals who was matched up with Match. And a ex-husband had stated that she met Wade Ridley on Match.com, that she knew he was crazy and violent and made it known. She went to the police. She filed a restraining order, which we tried to get a copy of, but because they filed a motion to state discovery, we were not obligated, we could not proceed in that. But when we inquired of him, do you think she communicated this to Match? He said, I'm sure of it.  Now, when the case was originally filed, the first thing they did was a motion to state discovery. And then the second round, we were obligated to state discovery. I don't mean to interrupt. I'm sorry, but I just want to be clear. You're saying that the boyfriend of the ex-husband of the deceased said he feels sure that she told Match because she told everybody? Right, and our next step would have been to get a subpoena because we have her Yahoo email address. We would have been able to or would still like to be able to. I'm worried about spoilage at this point because it's eight, nine years old now. But we were hoping in 2003 to send a subpoena to Yahoo for the contents of her email. We would have been able to prove conclusively if, in fact, it existed that she communicated to Match amongst other legal authorities that she was, that this person was dangerous. But we were precluded from doing that. So could we still do that? Of course, if we're given the opportunity to proceed in discovery. They have taken great pains to stop us from investigating the case deeply. The other part of the investigation was a girl out of Texas because this guy is kind of a nomad, killed a girl in Arizona, attacked my client in Las Vegas, and broke the orbital bone of a girl in Texas. The individual in Texas had made, she had made reference that she met Match, she met Wade Ridley on Match, and we would be able to explore that. But none of these people really are too happy about participating in this. The family of Ann Simonson said that they've been destroyed by this event and they want to let it go and essentially leave us alone. And this is not an easy route to pursue without any authority to conduct discovery. But the special relationship I'm asking this court to acknowledge, the same judge that ruled on this case recognized a special relationship between a businessman and a patron wherein a guy went to Bass Pro Shops, bought a crossbow, and it snapped and hurt him. And the judge said, yeah, there is a duty to warn there, there is a special relationship between a Bass Pro Shop salesman named Kevin Williams, and a person who walks in to purchase a bow and arrow. Mary Kay Beckman had a special relationship with Match.com by paying her membership fees and assuming that this sea of people that Match.com was going to pair her up with. But what are the elements of the special relationship? In this case, what creates the special relationship? It's very clear. In Shialaba, it says the ability of one of the parties to provide for the protection of themselves is limited by the information of the defendant. Now, why is it limited? Because the defendant had noticed that Wade Ridley was dangerous and yet failed to warn her. So her ability to have that information, it's denied. They curate, in their own words, they curate the information and they digest the data and they go a step further than just throwing up profiles. They actually match people. And in this particular case, they sent an email to my client, Mary Kay Beckman, and they said to Mary Kay, these are your five matches of the day. They recommended winking and starting this conversation. Wade Ridley was one of them. And if we can establish at that point that they knew he was. Does Match post anything like a disclaimer like, you know, we don't make any representations on our own on the background of any member or something like that? Judge, interesting question. They have provided in their brief and they have provided since they have provided multiple times, years after the fact, their terms of service with no date, no reference. And I'm not able to conduct discovery and say that wasn't the term of service there. You weren't as clear about the risks of dating because it was newer than. They attached in their motion to dismiss, which really should convert it to a motion for summary judgment, their terms of service that might have had the warning Your Honor is referencing. But I don't know if that warning was there when Mary Kay Beckman signed up in September of 2010. I would like to conduct the discovery to make that determination and see how specific they were in regard to the perils of dating and their lack of guarantees of the safety of the people that they were pairing up Mary Kay Beckman with. All right. Thank you. Thank you, Judge. Your Honor, I apologize. May it please the Court. Michael Chia for Match.com. Can you speak right into the microphone? Yes, Your Honor. Michael Chia for Match.com. May it please the Court. With me is Kurt Anderson, whom you've heard from earlier. I want to start off by responding to a few of the questions that the panel asked Mr. Anderson about where in the complaint does any allegation appear. It's in paragraph 24, in which it says, Upon information and belief, Match received complaints that subscribers commonly known as Wade Ridley, Wade Williams, or others harassed, threatened, and or violently attacked other women utilizing Match's service. That's as bare bones as an allegation can get. That is a nothing more than a conclusory allegation that is not entitled to the presumption of truth. Well, although it could have been more specific, I don't think it's a mere legal conclusion. There are some facts there. My question to Mr. Seggese was that, because at the last hearing, I thought that would be the first thing in his complaint. The question is whether what he was required to put in his complaint. And it seems like there's some reference to some facts here. These are legal conclusions couched as facts. They're no different from those alleged in Twombly and Iqbal. Twombly said repeatedly the ILX conspired to keep the SELEX out of their market. They had an agreement in restraint of trade. In Iqbal, the plaintiff alleged that Attorney General Ashcroft and FBI Director Mueller conspired against him based on his race, nationality, et cetera. Those are also factual allegations in some sense, but at the end of the day, there's nothing to support it that's conclusory. And in the other cases this Court has decided that relate to user-generated content, like the Yelp cases, this Court has specifically rejected claims like, yeah, Yelp made up the reviews. Is it your position that even if Match had actual knowledge that Mr. Ridley had violently attacked these two other women he met through Match, that plaintiff still has no relief under Nevada law? Well, first of all, Your Honor, let me just be clear before I answer this question, because last time I answered this question like this, I was — my words were taken out of context. Match does do a lot of things to take down content, and it would have, had it had knowledge, done something. There's a lot of things that Match does do that it doesn't have a legal obligation to do. Our position, though, is that under Nevada law, from what we have here, there's no information that would be useful to convey to anyone. This is a vague supposition of prior harm. There would be nothing to convey to people. And we — our view is there's no — first of all, there's no special relationship between Match.com and millions of subscribers. Well, that's the question, though, whether this circumstance should be recognized as a special relationship. But you said if Match knew those things, there are a lot of things Match would do. Like what? What's Match's policy now? Suppose, you know, hypothetically speaking, they had information that some guy signed up, you know, had been — had been reported as having, you know, sexually abused two dates. Would they — would they report that to anybody who, you know, was inquiring about this member? They would remove the profile promptly. And Match's policy is to be liberal in removing content profiles where it has allegations from other users that this person has done something bad. The reason why it's unworkable to then require a duty to warn is that we don't know exactly what happened. We can't verify whether or not these things occurred. And to give a proper warning — Well, you could say — I mean, obviously you could say, you know, we have these reports but they're not verified. Right. But then we — Did you simply say that? We would have to then disclose the user's personal information. People sign up on Match. They're anonymous. We would have to say, this person that was, you know — Right. Nevada guy, 66, really John Smith, and he's actually, you know, a serial rapist. Well, let me ask you this. What's sufficient to enable Match, in your view, to disclose the information? A criminal conviction? I would think that would be a helpful information. But, again, I don't think — I think we're looking through the wrong lens. It's — there has to be a special relationship before there is a duty to disclose. The duty here is solely based on the asymmetry of information. That's not enough to create a duty to disclose. If that's true, then every plaintiff in a duty to warn case wins. Right? There's no limiting principle to a duty to warn. In fact, Mary Kay Beckman would have a duty to warn Match after she received threatening texts from Wade Ridley on the theory that, you know, she had more information at that time and then Match could have used that information to pass on to other subscribers. That leads to a situation where everyone is constantly warning everyone else in the world. My understanding — I'm sorry. Go ahead. My understanding is that the claim is predicated on the defendant informing the plaintiff that this Match is one that she should consider pursuing. By that act, the defendant set in motion this chain of events. The act was not known to be unreasonable at the time, but according to the plaintiff, in due course, Match.com found out that this person violently attacked women. At that juncture, as I understand the claim, Match.com knew that its original act had created a danger to this foreseeable victim, this person who was readily identifiable, the one they told to wink at Mr. Ridley. And on that basis, whether you want to call it a special relationship or something else, they had an obligation to warn. Not an obligation to control the behavior of Mr. Ridley, an obligation to control their own behavior. They had an obligation to issue a warning to a foreseeable victim. Well, Your Honor, in the brick-and-mortar cases concerning third parties, such as the ones we've been cited here to in Sparks and Scalaba, which plaintiff has relied on, there's generally no duty to control once the person's off the premises. I'm not asking you to discuss that. I would like to know why the defendant's own act in pairing the plaintiff with Mr. Ridley did not provide a basis for a duty to warn when they learned, according to the plaintiff, that Mr. Ridley was a killer. Your Honor, that provides only a but-for relationship with the harm. It doesn't create a special duty in and of itself. Match is in the business of showing people other daters who are compatible with them based on the personal characteristics that they and the other persons have provided. There's no human being at match that's looking through profiles and sending them out. When you get a match, quote-unquote match, or when you see someone that's compatible, all you are seeing is a mere reflection of what you have asked to see. Let me ask, can I just follow up? By undertaking to match Ms. Beckman with other users, didn't match take over control over Ms. Beckman's decision-making? Why doesn't this give rise to a special punishment? No, absolutely not, Your Honor. The way the website's architected is actually to put control in the hands of the dater. The website doesn't play a role in telling people who to date, how to communicate with them, what to say, whether or not to look at the middle. What about the wink? The wink, that's not even implemented in the complaint. And that would be a user-generated, that wink is a user-generated action. So to the extent that occurred, it would have been either Ms. Beckman or Mr. Ridley winking to one another. Match doesn't do that on its own initiative. All we have is a website where you can look at profiles. It is not, you know, making any representations or warranties about what is in those profiles. Counsel, I don't want to be unfair to you, but let me raise a question. The Restatement Second of Torts includes Section 321, which is entitled Duty to Act When Prior Conduct is Found to be Dangerous. I grant you this has not been cited, but following up on our colloquy a moment ago, let me read this to you. If the actor doesn't act and subsequently realizes, or should realize, that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect. Now, as far as I know, Nevada has never cited this section of the Restatement. But I wonder whether Nevada wouldn't want to consider something like that principle in this context, and should we give them an opportunity to do so? No, I don't think that a referral would be appropriate in this case. There are multiple reasons to dismiss this case, to affirm that it had nothing to do with Nevada state law, including the pleading issue, including the Communications Decency Act. And then we have the backdrop, the Communications Decency Act, which is a Federal law. This is also a matter of applying established Nevada cases to a specific FAT pattern, not creating, you know, new law in and of itself. The one thing I would say on just the Restatement is that the most on-point case in Nevada is Wiley v. Red, which is the alarm case. And one could arguably argue that by summoning the police to an alarm, by an alarm, the alarm company has created a danger for which it ought to notify the police. They should tell the police that there are dangerous dogs on the premises. And the Nevada Supreme Court said there's a germ of a relationship here, yes, the profit from the police responding to these homeowners, but there should not be a duty as a matter of public policy, because that would embrace a plethora of obligations that would make it very expensive to provide alarm services at low cost. And we have the same kind of issues here. Look, in a case where we absolutely know that there's a serial killer, perhaps. But in most cases, we are going to get some kind of complaint that falls very short of that. It's going to be a complaint of, you know, this guy was a creep. I didn't like this date. And to impose a duty of warn in that circumstance really opens up a match to a plethora of liability and a duty to investigate, a duty to look into things of which it really has no control and in which it is not the best suited person to be investigating all these things. And that, setting aside the issue of, you know, privacy rights for the people involved, this could create a, you know, a cost-free way to, you know, harm people online. Go around saying they have done something to me at match.com. Match.com will go and publish that and tell the world that you are now a child molester. That would be an absolutely awful result. Wouldn't Match's process of suggesting or matching individuals together perhaps qualify as the creation or development of content and therefore maybe not be subject to the CDA immunity? I think the court's already addressed that by dismissing the negligence claims, which, you know, had that embedded in them. But Batsel v. Smith makes very clear that whether you approach content creation as to, you know, the rejection of content or the affirmative selection, it makes no difference. So once Match receives information that was meant to be published online, any act of publishing that piece of information is subject to the CDA immunity. And here, everything turns back to Wade Ridley's profile. There's no way that this cannot be a case without his profile. And they even allege it in the complaint. Match affirmatively actively matched — sorry, actively left up the profile, which is — it couldn't be clearer that this is a CDA case. Let me ask a question that occurred to me from what you said. If, for instance, Match were to post complaints made against a member, right, would those postings be subject to the CDA? They might be under Batsel if it's objectively reasonable that the person sending them, you know, intends for that information to be published. That's the standard in Batsel. But by the same token, by even sending those things, Match is being thrust into the role of a publisher.  It's no different from getting a letter from the editor and from a citizen and deciding whether or not to publish that. So even if there are these complaints, that should be viewed as a separate ground for bringing this case within the CDA. Okay. All right. Thank you. Thank you very much. One more thing, if I could add, Your Honors, is that the Internet Brands case, there was actually on remand a decision which is unpublished. It's on PACER. I'd be happy to provide that to the court, but the court actually, the district court, Judge Walter, actually decides that there is no special relationship and the duty of warrant should not be imposed on Internet Brands. And we can provide that in due course. Thank you. Thank you, Your Honors. Thank you. I'll give you a minute. Your Honors, the basis for finding a special relationship in this particular case, it has a rationale that runs across the board for the duty to warrant. And that is it's on point, that since the ability of one of the parties to provide for their own protection has been limited in some way by his or her submission to the other, a duty should be imposed upon the one possessing control and thus the power to act to take reasonable precautions to protect the other from assaults by third parties. Now, if they send Mary Kay Beckman your matches of the day, and the computers, they know, they know that if she clicks the profile and has viewed it, they could easily generate a warning that is an email that is sent in response to that connection that says this person has received numerous complaints about violent tendencies or this person has, you know, preceded your own caution or beware. Same thing with Internet Brands, Jane Doe No. 14. This Court held that Internet Brands should have put up something that said, hey, preceded your own caution because we have actual knowledge of these people's danger. We're asking for the exact same thing in this situation, but even smaller because we're not saying you post, you know, Tom Smith 62 on the main board warning to all users because they mentioned in their brief that they would be defaming Tom Smith to millions of people. No, an individual warning to the email perhaps automatically generated that could put this person on notice that, hey, he's my match of the day, but this guy has 14 complaints in the last three months. I'm out. Not even the specifics of the complaint, but just give these individuals an opportunity to protect themselves. Match is in control of the information. Match is in a superior position to help other people make good conscious decisions and they are choosing to not do that. That is why I'm asking this Court to find a special relationship between Mary Kay Beckman and people similarly situated and the defendants so that moving forward, their ability to warn individuals of other dangerous individuals is set. Has your investigation revealed whether Mr. Ridley was arrested prior to the act of the defendant in sending the plaintiff his name as a match? He has a long criminal history, attempted suicide by cop. He was in and out of unseen asylums. He was created multiple arrests, maybe six. I produced a timeline while we were trying to conduct discovery and the timeline was just riddled with criminal history, yes. Violent criminal history, sorry. That history predated the Defendant's Act? Yes, by years. And it included attacks on women? Yes, violent actions with weapons, physical attacks, yes. On women? I have the timeline tucked in here somewhere, but I don't want to waste the Court's time. And that's also something we could use the subpoena power to subpoena that particular criminal case from, let's say, 2008, make a determination where she met the victim, where she met. It could be match. And did you communicate with match? Yes, I did. She could provide proof. So we need this case to be able, and we're asking the Court to allow us to move forward and recognize a special relationship. Thank you. Thank you, Judge. Thank you both for your arguments today, Mr. Seguis, Mr. Chao. The case of Mary Kay Beckman v. Match.com is submitted. The next case on the docket is Robert E. Levy v. County of Alpine.
judges: Tashima, Murguia, Chatigny